UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WALTER TOLLEFSON, INDIVIDUALLY AND FOR THE ESTATE OF JOHN TOLLEFSON, MARY STEINMAN, JESSICA MECKLENBURG, KATHRYN MILLER, RANDALL WENDING, INDIVIDUALLY AND FOR THE ESTATE OF MICHAEL WENDLING, CARRIE WENDLING, BROOKS SCHILD, INDIVIDUALLY AND FOR THE ESTATE OF RICHARD SHILD, BRYAN ANDERSON, JANET WASWO, JIM WASWO, ROBERT ANDERSON, BRIANA WASWO, JENNIFER WHITE, INDIVIDUALLY AND FOR THE ESTATE OF LUCAS WHITE, JULIA BROOKS, MARCUS WHITE, DEREK GAGNE, BENJAMIN SCHUMANN, INDIVIDUALLY AND FOR THE ESTATE OF JASON SCHUMANN, BRENT ANDERSON, KRISTIE NELSON, KAYLA NELSON, SHERRI COTTRELL, INDIVIDUALLY AND FOR THE ESTATE OF ERIC COTTRELL, BRANDY COTTRELL, MEGAN COTTRELL, JAMES COTTRELL, AND E.C., A MINOR, ANDREW TONG, NORMAN FORBES, IV., JONMARIE PEARSON, INDIVIDUALLY AND FOR THE ESTATE OF ANDREW PEARSON,<br><br>    Plaintiffs,<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>    Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No.: 1:17-cv- 1726**<br><br><br><br>**JURY TRIAL DEMANDED** |

## **COMPLAINT**

### I.    **NATURE OF THE ACTION**

1.      This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C.

§1605A (hereinafter "FSIA") for wrongful death, personal injury and related torts, by the estates

and families of United States nationals and/or members of the U.S. armed forces (as defined in

10 U.S.C. §101) who were killed or injured by Iran and/or its agents in Iraq from 2004 to 2011.

2.      Iran's aforementioned agents included the U.S.-designated Foreign Terrorist Organization (as that term is defined in 8 U.S.C. §1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) Hezbollah; the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist; and other terrorist agents that included a litany of Iraqi Shi'a terror groups referred to herein collectively as "Special Groups."

3.      The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to §6(j) of the Export Administration Act, §40 of the Arms Export Control Act, and §620A of the Foreign Assistance Act.

4.      The United States designated Hezbollah a Specially Designated Terrorist on January 25, 1995. Hezbollah was designated a Foreign Terrorist Organization by the United States on October 8, 1997, and it has retained that designation since that time. Hezbollah was designated a Specially Designated Global Terrorist by the United States on October 31, 2001, pursuant to E.O. 13224.

## II.      <u>JURISDICTION AND VENUE</u>

5.      This Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. §§1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against State Sponsors of Terrorism and their officials, employees and agents.

6.      28 U.S.C. §1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts.

7.      Venue is proper in this district pursuant to 28 U.S.C. §1391(f).

## III.    <u>THE DEFENDANT</u>

8.      At all times relevant to this Complaint, Defendant Iran is and was a foreign state within the meaning of 28 U.S.C. §1603 and designated a State Sponsor of Terrorism pursuant to §6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405(j)).

9.      Iran provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. §1605A, including the terrorist attacks in which Plaintiffs were killed, injured or maimed, and performed actions that caused the terrorist attacks and the harm to Plaintiffs herein.

10.     The Government of Iran is politically and ideologically hostile to the United States and its allies, and has consistently provided material support for acts of international terrorism, including extrajudicial killings, torture and hostage takings, particularly through its Islamic Revolutionary Guard Corps and its Lebanese proxy, Hezbollah.

11.     The Islamic Revolutionary Guard Corps ("IRGC") is nominally comprised of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations ("IRGC-QF")) in addition to a counterintelligence directorate and representatives of the Supreme Leader. Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747.

12.     According to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq … Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

13.     The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah,

which includes the flow of some of Iran's most sophisticated weapon systems, including military grade Explosively Formed Penetrators ("EFPs"), anti-tank guided missiles, and various rockets, such as the Fajr-5.

14.     Explosively Formed Penetrators were used to injure and kill Plaintiffs. Such bombs are sometimes inaccurately called "improvised explosive devices" ("IEDs"); in reality, the Explosively Formed Penetrators were not "improvised" but professionally manufactured and specifically designed by Iran and its agents to target U.S. and Coalition Forces' armor.

15.     In October 2007, the IRGC-QF was designated a Specially Designated Global Terrorist ("SDGT") pursuant to E.O. 13324 for its terrorism-related activities. The U.S. Treasury Department's press release announcing the designation noted that:

> The Qods Force has had a long history of supporting Hezbollah [sic]'s military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hezbollah [sic] in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hezbollah [sic] fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hezbollah [sic] and has assisted Hezbollah [sic] in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.* (Emphasis added.)

## IV.    IRAN'S MATERIAL SUPPORT TO ACTS OF TERRORISM IN IRAQ 2004-2011

### A.    ISLAMIC REVOLUTIONARY GUARD CORPS - QODS FORCE IN IRAQ

16.     Even before the U.S. invasion of Iraq in 2003, the IRGC-QF had long cultivated ties to Shi'a opposition groups opposed to Saddam Hussein's brutal regime, including the Badr Corps that was headquartered in Iran throughout Iraq in the 1990s.

17.     During that time, the Badr Corps smuggled men and weapons into Iraq to conduct

attacks against the Hussein regime.

18.     Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

19.     After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

20.     Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

21.     Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian proxies in Iraq from 2004-2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a.k.a. "The Engineer"), who later led Kata'ib Hezbollah.

22.     "Department 1000" of the IRGC-QF, known as the Ramezan Corps, was in charge of Iraq operations and remains the largest Qods Force command outside of Iran. It coordinated, armed and influenced the Badr Organization.

23.     Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups operations in Iraq.

24.     A segment of senior Special Groups commanders such as Al-Muhandis are, or were, initially Badr Corps personnel.

25.     President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended."

26.     On May 23, 2003, the Coalition Provisional Authority established as the interim government for Iraq disbanded the Iraqi military forces.

27.     The U.N. Security Council authorized the post-conflict occupation of Iraq by

Coalition Forces in October 2003 to maintain "security and stability." S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

28.     Although U.S. policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. peacekeeping efforts in Iraq as a potential threat to its regime.

29.     Rather than engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence in Iraq.

30.     After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization.

31.     In addition to its coordination with the Badr Organization, the Ramezan Corps also cultivated, armed, trained and supported several Shi'a terror groups in Iraq that the U.S. military later termed "Special Groups."

32.     Although a June 7, 2004 U.N. Security Council Resolution (S.C. Res. 1546, U.N. Doc. S/RES/1546) expressly assigned Coalition Forces in Iraq the task of helping Iraq "*by preventing and deterring terrorism*," Iran set out to target Coalition Forces and force them out of Iraq.

33.     In sum, from October 16, 2003 onward, even though U.S. military personnel in Iraq were participants in an internationally recognized peace keeping mission, Iran embarked on a policy of terrorism, murder, kidnapping and torture to thwart those efforts.

34.     Iran opposed U.S. peacekeeping efforts and initiated acts of international terrorism against American military personnel, Coalition Forces and Iraqi citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country.

35.     Iran, through its authorized agents and instrumentalities acting within the scope of their employment, agency and direction from Iran, provided material support and/or resources that facilitated acts of torture, extrajudicial killing and hostage taking that caused personal injury or death to more than one thousand Americans in Iraq.

36.     In particular, Iranian agents developed and cultivated Shi'a Special Groups, providing training in the use of Explosively Formed Penetrators, Improvised Rocket Assisted Munitions, rocket-propelled grenades, sniper fire and mortars and operational and computer security.

**B.     SHI'A "SPECIAL GROUPS"**

**1.     JAYSH AL MAHDI and the PROMISED DAY BRIGADES**

37.     Jaysh al Mahdi (the "Mahdi Army" or "JAM") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003.

38.     Like the Badr Organization, it received support and training from the IRGC.

39.     On April 18, 2004 it led the first major armed confrontation against U.S.-led forces in Iraq from the Shi'a community.

40.     Jaysh al Mahdi was co-founded by Imad Mughniyah, one of Hezbollah's senior commanders, acting under the direction of Iran.

41.     Jaysh al Mahdi expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population. JAM was able to gain initial control in many of the neighborhoods surrounding Baghdad (including "Sadr City") by offering the Shi'a population protection and social services.

42.     Al-Sadr purportedly dissolved part of his militia after 2007, but he maintained a small group of Iranian-supported terrorists called the Promised Day Brigades to carry out attacks against Coalition Forces.

43.     The Promised Day Brigades received funding, training and weapons from the IRGC.

44.     The Promised Day Brigades actively targeted U.S. forces in an attempt to disrupt security operations and further destabilize Iraq. For example, on June 28, 2011 the Promised Day Brigades issued a statement claiming responsibility for 10 mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

## 2.     KATA'IB HEZBOLLAH

45.     For many years, Kata'ib Hezbollah functioned as Iran's go-to terrorist group in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks.

46.     Historically, Kata'ib Hezbollah operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

47.     On June 24, 2009 the United States designated Kata'ib Hezbollah a Foreign Terrorist Organization.

48.     The State Department's notice of Kata'ib Hezbollah's designation stated:

> The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers.  In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

49.     Kata'ib Hezbollah was also simultaneously designated a Specially Designated Global Terrorist because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

50.     The Treasury Department's press release announcing Kata'ib Hezbollah's

designation explained that Kata'ib Hezbollah had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces."

51.     The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating: "the IRGC-Qods Force provides lethal support to Kata'ib Hezbollah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

52.     The press release further reported that between March 2007 and June 2008, Kata'ib Hezbollah led a number of attacks against U.S. forces in Iraq, advising: "[a]s of 2008, Kata'ib Hezbollah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hezbollah. In one instance, Hezbollah provided training-- to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hezbollah members in Iran."

53.     Furthermore, the press release noted:

> Recordings made by Kata'ib Hezbollah for release to the public as propaganda videos further demonstrate that Kata'ib Hezbollah conducted attacks against Coalition Forces. In mid- August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hezbollah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hezbollah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hezbollah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

> One of the hard drives contained 35 attack videos edited with the Kata'ib Hezbollah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hezbollah conducting multiple attacks against Coalition Forces in Iraq.

> Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hezbollah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks

against the Government of Iraq if it signed the security agreement
with the United States.

54.     In 2008, the U.S. Department of Defense stated that Kata'ib Hezbollah, "also known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars."

55.     Kata'ib Hezbollah's leadership includes Abu Mahdi al-Muhandis (real name: Jamal al-Ibrahimi), a long-standing member of the Badr Organization who lived for many years in Iran.

56.     Al-Muhandis is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985.

57.     Al-Muhandis was designated a Specially Designated Global Terrorist in July 2009 on the same day Kata'ib Hezbollah was so designated. The press release noted:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hezbollah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons-to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.
>
> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices-- from

Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

58. In a July 2010 press briefing, U.S. General Ray Odierno described Kata'ib Hezbollah as "clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps]."

### 3.   ASA'IB AHL AL-HAQ ("LEAGUE OF THE RIGHTEOUS")

59. Asa'ib Ahl al-Haq is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that has conducted assassinations and operations against Iraqi civilians, Iraqi Security Forces and Coalition Forces.

60. Asa'ib Ahl al-Haq was originally established by a follower of Muqtada al-Sadr named Qais al-Khazali.

61. His brother, Laith Khazali, also helped lead the organization.

62. Asa'ib Ahl al-Haq split from al-Sadr's Jaysh al Mahdi in 2006. Since that time, Asa'ib Ahl al-Haq conducted thousands of IED attacks against U.S. and Iraqi forces; targeted

kidnappings of Westerners; launched rocket and mortar attacks on the U.S. Embassy; murdered American soldiers; and assassinated Iraqi officials.

63.    At all relevant times, Asa'ib Ahl al-Haq received significant funding, training and arms from Iran, and closely coordinated with Iran's IRGC-QF and Hezbollah.

64.    In particular, Lebanese Hezbollah operative Ali Musa Daqduq provided training to Asa'ib Ahl al-Haq terrorists.

65.    Hezbollah and the IRGC-QF provided Jaysh al Mahdi, the Promised Day Brigades, Kata'ib Hezbollah, Asa'ib Ahl al-Haq and other Shi'a groups with a variety of weapons used to target U.S. and Coalition Forces engaged in their post-2003 peacekeeping mission.

66.    These weapons included signature Iranian munitions such as Explosively Formed Penetrators and Improvised Rocket Assisted Munitions, as well as 107 mm rockets (often used as part of IRAMs), 120 mm and 60 mm mortars, RPG launchers and other small arms.

### C.    EXPLOSIVELY FORMED PENETRATORS

67.    One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings of U.S. citizens in Iraq was the financing, manufacturing and deployment of Explosively Formed Penetrators.

68.    As noted above, the EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

69.    EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. §2332a(2)(A).

70.    First used by Hezbollah against Israeli armor in Lebanon, EFPs are known as shaped charges, usually made with a manufactured concave copper disk and a High Explosive

packed behind the liner.

71.     In Iraq, EFPs were often triggered by a passive infra-red device that set off the explosion within the EFP's casing, forcing the copper disk forward and turning it into a high velocity slug that could pierce most military-grade armor.

72.     To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

73.     EFPs are far more sophisticated than homemade explosive devices such as traditional improvised explosive devices, and they are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

74.     Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005, the official identification of *specific* attacks as EFP attacks was not first publicly disclosed until 2010.

75.     In 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other Coalition Forces:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah [sic]. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah [sic], implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (emphasis added.)

76.     Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic

Operations of the Multi-National Force – Iraq stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

77.     Brigadier Gen. Kevin Bergner commented on Iran funding of Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. […] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq…. The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the most deadly form of improvised explosive device -- and funding from Iran. They also have received planning help and orders from Iran.

78.     In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, commented that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers -- IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." (emphasis added.)

79.     According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that

target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train- the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

80. Other U.S. Government reports, such as the Department of Defense's December 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that:

> Iranian Islamic Revolutionary Guard Corps - Qods Force (IRGC-QF) efforts to train, equip, and fund Shi'a extremists also continue despite reported assurances to Prime Minister Maliki that Iran will cease lethal aid.

81. These observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan …

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as

civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

### D.      IMPROVISED ROCKET ASSISTED MUNITIONS (IRAMs)

82.     Along with EFPs, Improvised Rocket Assisted Munitions were a signature weapon of Shi'a militias in Iraq that were supplied by the Iranian Revolutionary Guard Corps.

83.     An IRAM is a rocket-fired improvised explosive device made from a large metal canister – such as a propane gas tank – filled with explosives, scrap metal and ball bearings and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties

84.     According to The Joint Improvised Explosive Device Defeat Organization (JIEDDO) of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

85.     Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of *specific* attacks as IRAM attacks was not publicly disclosed until 2010.

86.     IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

87.     All of the foregoing support from Iran and its agents for attacks on Coalition Forces and Iraqi civilians was financed and facilitated in substantial part by material support in the form of funds transfers initiated by Iran through Iranian banks on behalf of and for the benefit of Hezbollah and other agents of Iran's IRGC.

**V.      THE PLAINTIFFS**

**ATTACK 1:   JULY 27, 2005 – BAGHDAD IRAQ**

**A.  The Tollefson Family**

88.      John Tollefson was a citizen of the United States when he was killed in Iraq.

89.      On July 27, 2005, John Tollefson, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

90.      John Tollefson was killed in the attack.

91.      The weapon used to kill John Tollefson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

92.      Plaintiff Walter Tollefson is a citizen of the United States and domiciled in the State of Wisconsin. He is the father of John Tollefson.

93.      Plaintiff Mary Steinman is a citizen of the United States and domiciled in the State of Wisconsin. She is the mother of John Tollefson.

94.      Plaintiff Jessica Mecklenburg is a citizen of the United States and domiciled in the State of Wisconsin. She is the sister of John Tollefson.

95.      Plaintiff Kathryn Miller is a citizen of the United States and domiciled in the State of Wisconsin. She is the sister of John Tollefson.

96.      Plaintiff Walter Tollefson brings an action individually and on behalf of the Estate of John Tollefson, as its anticipated legal representative.

97.      As a result of the attack, and the death of John Tollefson, Plaintiffs Walter Tollefson, Mary Steinman, Jessica Mecklenburg and Kathryn Miller have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son and brother's society, companionship, comfort, advice and counsel.

## ATTACK 2:   SEPTEMBER 26, 2005 – SHAIBAH, IRAQ

### B. **The Wendling Family**

98.     Michael Wendling was a citizen of the United States when he was killed in Iraq.

99.     On September 26, 2005, Michael Wendling, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

100.    Michael Wendling was killed in the attack.

101.    The weapon used to kill Michael Wendling was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

102.    Plaintiff Randall Wendling is a citizen of the United States and domiciled in the State of Wisconsin. He is the father of Michael Wendling.

103.    Plaintiff Carrie Wendling is a citizen of the United States and domiciled in the State of Wisconsin. She is the mother of Michael Wendling.

104.    Plaintiff Randall Wendling brings an action individually and on behalf of the Estate of Michael Wendling, as its anticipated legal representative.

105.    As a result of the attack, and the death of Michael Wendling, Plaintiffs Randall Wendling and Carrie Wendling have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son's society, companionship, comfort, advice and counsel.

## ATTACK 3:   DECEMBER 4, 2005 – BAGHDAD, IRAQ

### C. **The Schild Family**

106.    Richard Schild was a citizen of the United States when he was killed in Iraq.

107.    On December 4, 2005, Richard Schild, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

108.    Richard Schild was killed in the attack.

109.    The weapon used to kill Richard Schild was an Iranian-manufactured EFP provided

to Iranian-funded and -trained terror operatives in Iraq.

110.   Plaintiff Brooks Schild is a citizen of the United States and domiciled in the State of South Dakota. He is the brother of Richard Schild.

111.   Plaintiff Brooks Schild brings an action individually and on behalf of the Estate of Richard Schild, as its anticipated legal representative.

112.   As a result of the attack, and the death of Richard Schild, Plaintiff Brooks Schild has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of his brother's society, companionship, comfort, advice and counsel.

### ATTACK 4:   OCTOBER 23, 2006 – BAGHDAD, IRAQ

### D.   The Anderson Family

113.   Plaintiff Bryan Anderson is a citizen of the United States and domiciled in the State of Illinois.

114.   On October 23, 2006, Plaintiff Bryan Anderson, was serving in the U.S. military in Iraq.

115.   Plaintiff Bryan Anderson was injured when an EFP exploded near his vehicle.

116.   The weapon used to injure Plaintiff Bryan Anderson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

117.   Plaintiff Janet Waswo is a citizen of the United States and domiciled in Illinois. She is the mother of Bryan Anderson.

118.   Plaintiff Jim Waswo is a citizen of the United States and domiciled in Illinois. He is the father of Bryan Anderson.

119.   Plaintiff Robert Anderson is a citizen of the United States and domiciled in Illinois. He is the twin brother of Bryan Anderson.

120.   Plaintiff Briana Waswo is a citizen of the United States and domiciled in Illinois. She

is the sister of Bryan Anderson.

121.    As a result of the attack, Plaintiff Bryan Anderson has lost both legs and the majority of his left arm.

122.    As a result of the attack, and the injuries he suffered, Plaintiff Bryan Anderson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

123.    As a result of the attack, and the injuries suffered by Bryan Anderson, Plaintiffs Janet Waswo, Jim Waswo, Robert Anderson and Briana Waswo have experienced severe mental anguish and extreme emotional pain and suffering.

## ATTACK 5:   NOVEMBER 6, 2006 – BAGHDAD, IRAQ

### E.   The White Family

124.    Lucas White was a citizen of the United States when he was killed in Iraq.

125.    On November 6, 2006, Lucas White, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

126.    Lucas White was killed in the attack.

127.    The weapon used to kill Lucas White was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

128.    Plaintiff Jennifer White is a citizen of the United States and domiciled in the State of Idaho. She is the widow of Lucas White.

129.    Plaintiff Julia Brooks is a citizen of the United States and domiciled in the State of Montana. She is the mother of Lucas White.

130.    Plaintiff Marcus White is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Lucas White.

131.    Plaintiff Jennifer White brings an action individually and on behalf of the Estate of Lucas White, as its legal representative.

132.     As a result of the attack, and the death of Lucas White, Plaintiffs Jennifer White, Julia Brooks and Marcus White have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband, brother and son's society, companionship, comfort, advice and counsel.

### ATTACK 6:  JANUARY 22, 2007 – BAGHDAD, IRAQ

#### F.  The Gagne Family

133.     Plaintiff Derek Gagne is a citizen of the United States and domiciled in the State of Minnesota.

134.     On October 23, 2006, Plaintiff Derek Gagne, was serving in the U.S. military in Iraq.

135.     Plaintiff Derek Gagne was injured when an EFP exploded near his vehicle.

136.     The weapon used to injure Plaintiff Derek Gagne was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

137.     As a result of the attack, Plaintiff Derek Gagne has lost his right leg below the knee and had severe damage to his left eye as well as his face.

138.     As a result of the attack, and the injuries he suffered, Plaintiff Derek Gagne has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### ATTACK 7:  MAY 19, 2007 – AL DIWANIYAH, IRAQ

#### G.  The Schumann Family

139.     Jason Schumann was a citizen of the United States when he was killed in Iraq.

140.     On May 19, 2007, Jason Schumann, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

141.     Jason Schumann was killed in the attack.

142.     The weapon used to kill Jason Schumann was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

143.    Plaintiff Benjamin Schumann is a citizen of the United States and domiciled in the State of Minnesota. He is the brother of Jason Schumann.

144.    Plaintiff Brent Anderson is a citizen of the United States and domiciled in the State of Minnesota. He is the brother of Jason Schumann.

145.    Plaintiff Kristie Nelson is a citizen of the United States and domiciled in the State of Minnesota. She is the sister of Jason Schumann.

146.    Plaintiff Kayla Nelson is a citizen of the United States and domiciled in the State of Minnesota. She is the sister of Jason Schumann.

147.    Plaintiff Benjamin Schumann brings an action individually and on behalf of the Estate of Jason Schumann, as its anticipated legal representative.

148.    As a result of the attack, and the death of Jason Schumann, Plaintiffs Benjamin Schumann, Brent Anderson, Kristie Nelson and Kayla Nelson have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their brother's society, companionship, comfort, advice and counsel.

## ATTACK 8:   AUGUST 13, 2007 – QARRAYAH, IRAQ

### H.  The Cottrell Family

149.    Eric Cottrell was a citizen of the United States when he was killed in Iraq.

150.    On August 13, 2007, Eric Cottrell, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

151.    Eric Cottrell was killed in the attack.

152.    The weapon used to kill Eric Cottrell was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

153.    Plaintiff Sherri Cottrell is a citizen of the United States and domiciled in the State of Maryland. She is the widow of Eric Cottrell.

154.    Plaintiff Brandy Cottrell is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Eric Cottrell.

155.    Plaintiff Megan Cottrell is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Eric Cottrell.

156.    Plaintiff James Cottrell is a citizen of the United States and domiciled in the State of Maryland. He is the son of Eric Cottrell.

157.    Plaintiff, E.C., a minor, represented by his legal guardian Sherri Cottrell, is a citizen of the United States and domiciled in the State of Maryland. He is the son of Eric Cottrell.

158.    Plaintiff Sherri Cottrell brings an action individually and on behalf of the Estate of Eric Cottrell, as its legal representative.

159.    As a result of the attack, and the death of Eric Cottrell, Plaintiffs Sherri Cottrell, Brandy Cottrell, Megan Cottrell, James Cottrell, and E.C., a minor, have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband and father's society, companionship, comfort, advice and counsel.

### ATTACK 9:   AUGUST 18, 2007 – BAGHDAD, IRAQ

### I.   The Tong Family

160.    Plaintiff Andrew Tong is a citizen of the United States and domiciled in the State of Washington.

161.    On August 18, 2007, Plaintiff Andrew Tong, was serving in the U.S. military in Iraq.

162.    Plaintiff Andrew Tong was injured when an EFP exploded near his vehicle.

163.    The weapon used to injure Plaintiff Andrew Tong was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

164.    As a result of the attack, Plaintiff Andrew Tong has lost his right leg.

165.    As a result of the attack, and the injuries he suffered, Plaintiff Andrew Tong has

experienced severe physical and mental anguish and extreme emotional pain and suffering.

### ATTACK 10: MARCH 17, 2008 – SADR CITY, IRAQ

**J.   The Forbes Family**

166.    Plaintiff Norman Forbes, IV, is a citizen of the United States and domiciled in the State of Texas.

167.    On March 17, 2008, Plaintiff Norman Forbes, IV, was serving in the U.S. military in Iraq.

168.    Plaintiff Norman Forbes, IV, was injured when an EFP exploded near his vehicle.

169.    The weapon used to injure Plaintiff Norman Forbes, IV, was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

170.    As a result of the attack, Plaintiff Norman Forbes, IV, has suffered two femoral fractures and lost a portion of his left hand.

171.    As a result of the attack, and the injuries he suffered, Plaintiff Norman Forbes, IV, has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### ATTACK 11: APRIL 30, 2008 – BAGHDAD, IRAQ

**K.   The Pearson Family**

172.    Andrew Pearson was a citizen of the United States when he was killed in Iraq.

173.    On April 30, 2008, Andrew Pearson, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

174.    Andrew Pearson was killed in the attack.

175.    The weapon used to kill Andrew Pearson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

176.    Plaintiff Jonmarie Pearson is a citizen of the United States and domiciled in the State of New York. She is the widow of Andrew Pearson.

177.    Plaintiff Jonmarie Pearson brings an action individually and on behalf of the Estate of Andrew Pearson, as its legal representative.

178.    As a result of the attack, and the death of Andrew Pearson, Plaintiff Jonmarie Pearson has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of her husband's society, companionship, comfort, advice and counsel.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**AGAINST DEFENDANT ON BEHALF OF EACH PLAINTIFF IDENTIFIED HEREIN
WHO SURVIVED AN ACT OF INTERNATIONAL TERRORISM
FOR DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL
KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN PERSONAL
INJURY UNDER 28 U.S.C. §1605A(c)**

179.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

180.    Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendant's provision of material support (within the meaning of §1605A(h)(3)) to terror operatives in Iraq who engaged in extrajudicial killing and who injured Plaintiffs.

181.    As a direct and proximate result of the willful, wrongful, and intentional acts of Defendant and its agents, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses.

182.    Plaintiffs' compensatory damages include, but not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses determined by the trier of fact.

183.    The conduct of Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages against Defendant

pursuant to 28 U.S.C. §1605A(c).

## SECOND CLAIM FOR RELIEF
### AGAINST DEFENDANT ON BEHALF OF THE ESTATES OF PLAINTIFFS IDENTIFIED HEREIN FOR DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN WRONGFUL DEATH UNDER 28 U.S.C. §1605A(c)

184.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

185.    The Estates of Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the decedents who were grievously injured by Defendant's provision of material support (within the meaning of §1605A(h)(3)), to terror operatives in Iraq who engaged in the acts of extrajudicial killing that caused the decedents' deaths.

186.    As a direct and proximate result of the willful, wrongful, and intentional acts of Defendant and its agents, the decedents listed in the foregoing paragraphs endured physical injury, extreme mental anguish, and pain and suffering that ultimately lead to their deaths.

187.    Defendant is therefore liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss (or loss of income to the estates).

188.    Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. §1605A(c).

## THIRD CLAIM FOR RELIEF
### AGAINST DEFENDANT ON BEHALF OF THE FAMILIES OF PLAINTIFFS IDENTIFIED HEREIN AS INJURED OR KILLED AS A RESULT OF DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING FOR LOSS OF SOLATIUM AND INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS UNDER 28 U.S.C. § 1605A(c)

189.    Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

190.    Defendant's acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking were intended to inflict severe emotional distress on Plaintiffs.

191.    As a result of Defendant's acts, the families of individuals identified in the foregoing paragraphs as injured or killed as a result of Defendant's acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking have suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

192.    Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. §1605A(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

(a)    Judgment for all Plaintiffs against Defendant for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and loss of solatium, in amounts to be determined at trial;

(b)    Judgment for Plaintiff Estates against Defendant for compensatory damages for wrongful death, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and any pecuniary loss (or loss of income to the estates) in amounts to be determined at trial;

(c)    Judgment for all Plaintiffs against Defendant for punitive damages in an amount to be determined at trial;

(d)    Plaintiffs' costs and expenses;

(e)     Plaintiffs' attorney's fees; and

(f)     Such other and further relief as the Court finds just and equitable.


Dated: August 24, 2017                    Respectfully submitted,


                                          THE DRISCOLL FIRM, P.C.

                          By:     ___/s/John J. Driscoll_____
                                  JOHN J. DRISCOLL, # MO0003
                                  211 N. Broadway, 40th Floor
                                  St. Louis, Missouri  63102
                                  314-932-3232 telephone
                                  314-932-3233 facsimile
                                  john@thedriscollfirm.com

                                  *Attorney for Plaintiffs*